# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01010-COA

**CHELSEA BUMPOUS AND JASON BUMPOUS O/B/O A.B.**                    **APPELLANTS**

**v.**

**TISHOMINGO COUNTY SCHOOL DISTRICT**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/14/2022 |
| TRIAL JUDGE: | HON. MICHAEL PAUL MILLS JR. |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES R. FRANKS JR. |
| | WILLIAM R. WHEELER JR. |
| ATTORNEYS FOR APPELLEE: | DANIEL J. GRIFFITH |
| | KATHERINE M. PORTNER |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 11/14/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1.    Chelsea and Jason Bumpous, on behalf of their son A.B.,[1] sued the Tishomingo County School District (TCSD) for negligent supervision resulting in A.B.'s injury during show choir class. The Tishomingo County Circuit Court granted summary judgment in favor of TCSD. Finding that there were no genuine issues of material fact and that TCSD was entitled to the judgment as a matter of law, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    On February 27, 2020, eighth-grade student A.B. was attending show choir class at

---

[1] We use initials in the place of minor children's names in this opinion.

Iuka Middle School with other eighth and seventh-grade students. His show choir teacher was Bethany Cheaves. On that day, Cheaves was preparing for an upcoming class trip to Nashville, Tennessee. Contacting the students' parents about the trip was on Cheaves' agenda.

¶3. Show choir was a unique class compared to others at Iuka Middle School in that the students were not expected to stay seated the entire time. Rather than using desks, students sat in fold-up chairs to allow for easy movement around the room. Students were often split into groups, with Cheaves working with particular groups on singing or choreography. When students were not receiving direct teaching from Cheaves, they worked on their singing or choreography alone or in their groups. It was not unusual or against the rules for students to have their cell phones out to help with lyrics or choreography. Students described the class as a "safe" place where all students were friends with each other. Cheaves described the class as "a family."

¶4. On the day of the incident, Cheaves had given the students special permission to have their phones out to contact their parents for permission to attend an upcoming Nashville field trip. Cheaves testified that this was not a typical day of show choir class because of the upcoming trip. Cheaves was sitting at her desk surrounded by three to four other students who had their parents on the phone. Cheaves was talking with each student's parents to get their permission to drive the students to Nashville. During this time, two students in the class, K.M. and D.C., decided to film a "TikTok challenge." This particular challenge was dubbed "Skull Crusher." The challenge was to trick someone into participating in a "jump

2

challenge," where participants would try and jump as high as they could. Meanwhile, the intention was to kick the unsuspecting jumper's feet out from under him, causing him to fall. K.M. and D.C. chose their friend A.B. as the unlucky victim.

¶5. K.M. set her phone against the wall and started recording. They walked over to A.B. and asked if he wanted to participate in their "jump challenge." A.B. willingly agreed to participate, unaware of the challenge's true intentions. The three students were approximately three to six feet away from Cheaves' desk. When all three students jumped together, K.M. and D.C. kicked A.B.'s legs out from under him, causing him to hit the ground hard. Cheaves testified that she saw A.B. jump and fall. This was disputed by other students' testimonies that stated Cheaves had her back turned and did not see A.B. fall. Cheaves immediately checked on A.B. and cleared the room.

¶6. The school nurse attended to A.B., and his parents were contacted. He was taken to North Mississippi Medical Center in Tupelo, Mississippi, for treatment and evaluation. One of the school's administrators took a video of the cell phone recording and deleted the recording on the girl's phone. There was no evidence that the recording was ever posted to any social media site or sent to any other device. Assistant Principal Smith, who was aware of the TikTok trend, conducted an investigation, and ultimately the students involved were suspended for three days.

¶7. In February 2021 the Bumpouses filed suit against TCSD on behalf of A.B. for negligent supervision. Cheaves, Smith, K.M., D.C., and several other students were deposed. TCSD filed a motion for summary judgment on which a hearing was held. The circuit court

granted summary judgment, finding that the injury to A.B. was not foreseeable.

## STANDARD OF REVIEW

¶8.     "We review the grant or denial of a motion for summary judgment de novo, viewing the evidence in the light most favorable to the party against whom the motion has been made." *Karpinsky v. Am. Nat. Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c).  "A material fact is one that matters in an outcome determinative sense." *Gillespie v. Lamey*, 338 So. 3d 653, 657 (¶9) (Miss. Ct. App. 2022) (internal quotation marks omitted).  "[T]he existence of a hundred contested issues of fact will not thwart summary judgment where there is no genuine dispute regarding the material issues of fact." *Id.*

## DISCUSSION

¶9.     The appellants argue that the circuit court erred by granting the appellee's motion for summary judgment because a genuine issue of material fact exists as to whether or Cheaves and TCSD breached their duty and failed to utilize ordinary care and take reasonable steps to prevent a foreseeable injury.

¶10.    To recover for negligent supervision, the Bumpouses bear the burden of proving the existence of a duty, a breach of duty, causation, and damages. *Faul v. Perlman*, 104 So. 3d 148, 153 (¶14) (Miss. Ct. App. 2012).  "Duty and breach must be established first." *Chaffee ex rel. Latham v. Jackson Public Sch. Dist.*, 270 So. 3d 905, 907 (¶10) (Miss. 2019).  "The

4

elements of breach and proximate cause must be established by the plaintiff with supporting evidence." *Id.*

¶11. "Public schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." *Id.* at 907-8 (¶11) (quoting *Henderson ex rel. Henderson v. Simpson Cnty. Pub. Sch. Dist.*, 847 So. 2d 856, 857 (¶3) (Miss. 2003) (quoting *L.W. v. McComb Sep. Mun. Sch. Dist.*, 754 So. 2d 1136, 1143 (¶29) (Miss. 1999), *overruled on other grounds by Miss. Transp. Comm'n v. Montgomery*, 80 So. 3d 789, 797 (¶26) (Miss. 2012)). "The school is not an insurer of the safety of pupils, but has the duty of exercising ordinary care, of reasonable prudence, or of acting as a reasonable person would act under similar circumstances." *J.E. v. Jackson Public Sch. Dist.*, 264 So. 3d 786, 791 (¶13) (Miss. Ct. App. 2018) (quoting *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc.*, 759 So. 2d 1203, 1213 (¶40) (Miss. 2000)).

¶12. Both parties agree that TCSD had a duty of ordinary care to A.B. The Bumpouses' sole argument on appeal is that genuine issues of material facts remain in the case. TCSD argues that there are no *material* facts in dispute.

¶13. The Bumpouses' disputed facts can be broken down into four categories: (1) Cheaves' classroom cell phone policy; (2) Cheaves' inattentiveness; (3) Cheaves' witnessing the event; and (4) Assistant Principal Smith's knowledge of this TikTok challenge and lack of proper dissemination to the teachers.

¶14. We find there are no disputed material facts as to Cheaves' classroom cell phone policy. The Bumpouses do not dispute that Cheaves allowed the students to have their

5

phones out on the day of A.B.'s injury. Rather, they provide testimony from A.B. and his fellow classmates that throughout the semester students often had their phones out in class despite no explicit permission.

¶15. The Bumpouses' reliance on the school's cell phone policy is misplaced. The fact that students had their phones out on the day of A.B.'s injury does not support the Bumpouses' claim of breach because students had Cheaves' permission. Furthermore, Smith testified that it was not unusual or against the rules for students to use their phones in show choir class. The school's cell phone policy was based on the guideline that individual teachers have the option to enforce how cell phones are used or allowed in class. Smith testified that she was okay with the show choir students using their phones to assist with their learning in that class. As noted above, the duty of ordinary care is that of a reasonable person acting in similar circumstances—in this case, a reasonable show choir teacher. *J.E.*, 264 So. 3d at 791 (¶13). The use of cell phones that day was permitted and reasonable considering how cell phones were used in show choir and that parental engagement/permission was needed for the upcoming trip.

¶16. The Bumpouses' argument about Cheaves' inattentiveness has a similar problem as the cell phone issue. Much of the Bumpouses' evidence points to Cheaves' allegedly improper supervision generally throughout the semester, not just on the day of the incident. Taking all inferences in favor of the Bumpouses, we assume that Cheaves was often an inattentive teacher in show choir class. However, the only fact disputed on the day of the incident was whether Cheaves actually witnessed A.B. jump and fall. While this is in

dispute, the fact is not material and does not provide support against the grant of summary judgment. Said another way, even if Cheaves did not witness A.B. fall, that does not show that Cheaves breached her duty as a reasonable show choir teacher.

¶17. In *Slade v. New Horizon Ministries Inc.*, 785 So. 2d 1077, 1079 (¶12) (Miss. Ct. App. 2001), this Court ruled in favor of a school in a negligent supervision action. In that case, a supervising teacher had been monitoring two groups of students: those in the school's gym and those outside the school's gym. *Id.* at 1078 (¶4). While the teacher was watching, a student collided with the plaintiff, causing the plaintiff to break her hip. *Id.* at (¶5). This Court compared the circumstances to *Summers*, a case in which a grant of summary judgment for the school was reversed. *Slade*, 785 So. 2d at 1079 (¶¶9-10) (citing *Summers ex rel. Dawson v. St. Andrew's Episcopal School Inc.*, 759 So. 2d 1203 (Miss. 2000)). The supreme court in *Summers* reversed the grant of summary judgment for the school, finding that a question of fact existed as to whether teachers were adequately supervising kindergarten students. *Summers*, 759 So. 2d at 1214 (¶¶48-51). The teachers were (1) away from the immediate area of the incident, (2) in a "blind spot" where they could not see the children, and (3) talking to each other, unaware that any incident occurred. *Id.* at 1213 (¶42).

¶18. In *Slade*, we found that *Summers* was distinguishable because the supervising teacher was "(1) within reasonable proximity of the incident (2) observing the children and (3) aware of the incident." *Slade*, 785 So. 2d at 1079 (¶11). This Court stated, "By all accounts, the injury to [the plaintiff] occurred suddenly and accidentally," and that the injury would not have been prevented even if the teacher was standing right beside the injured student. *Id.* at

7

(¶12). In addition, there was no evidence presented that the student's conduct had put the school on notice. *Id.* Because "there [was] no issue for the jury to resolve on the question of the adequacy of supervision, nor was [was] there any evidence the injury to [the plaintiff] was a foreseeable injury proximately related to inadequacy of supervision," summary judgment was affirmed. *Id.*

¶19. In *Henderson*, the plaintiff was injured after another student taunted and assaulted him in the presence of their teacher. *Henderson*, 847 So. 2d at 857 (¶1). The supreme court reversed a grant of summary judgment in favor of the school because it found several questions of material fact. *Id.* at (¶5). While the school had no knowledge of the aggressor student's violent propensities, the student's taunts could be heard "across the classroom" and the student made threatening gestures to the plaintiff for approximately one minute before striking him. *Id.* at (¶¶4-5). The supreme court stated, "[T]he factual circumstances surrounding the incident, namely, the loud taunting and the threatening gestures preceding the assault, bear on the question of the level of care exercised by the teacher in supervising her class at the time." *Id.* at 858 (¶7).

¶20. In the instant case, the disputed fact—whether Cheaves saw A.B. jump and fall—is not material. Like in *Slade*, Cheaves was in reasonable proximity of the incident, she was observing the students, and she was aware of the incident, which occurred suddenly. Unlike *Henderson*, Cheaves had no knowledge or notice that the incident was going to occur. In show choir class, it was commonplace for students to be moving around and practicing choreography. All the students were friends, so there was no indication that K.M. and D.C.

8

intended to harm A.B. "Absent special, dangerous circumstances, a school district does not have the duty of providing constant supervision of all movements of pupils at all times." *Chaffee*, 270 So. 3d at 909 (¶22) (quoting *Levandoski v. Jackson Cnty. Sch. Dist.*, 328 So. 2d 339, 341-42 (Miss. 1976)). Even assuming that Cheaves did not see A.B. fall or that she had her back turned to talk to other students, this fact is not material to her actions' reasonableness under the circumstances.

¶21. The dissent seems to project that this incident took place in a traditional school setting like a math or English class rather than a non-traditional show choir class. The dissent cites Mississippi Code Annotated section 37-9-69 (Rev. 2019), which charges teachers and school administrators to hold pupils "to strict account for disorderly conduct at school . . . ." Relying on this statute is misplaced because our caselaw tells us that the standard we should hold Cheaves and TCSD to is that of a reasonable person in the same or similar circumstances. *J.E.*, 264 So. 3d at 791 (¶13).

¶22. Regardless, TCSD was not in violation of section 37-9-69. The dissent argues TCSD violated the statute because students were on their phones in class and dancing to TikTok videos while Cheaves was not actively supervising them. However, the fact that students were on their phones and dancing to videos is not "disorderly conduct." Students were allowed to be on their phones and were often broken up into groups working on choreography while Cheaves was working with other students. Pranking a fellow classmate and causing his injury is disorderly conduct, and TCSD responded correctly and suspended both students involved for three days. TCSD followed the statute by "holding the pupils to

9

strict account for [their] disorderly conduct."

¶23. On the other hand, we should not hold Cheaves responsible for foreknowledge that two good friends of A.B. would pull a prank on him causing his injury. While we empathize with A.B.'s pain and suffering caused by the injury, we should not find liability where there is none.[2] In *Slade*, the injured student broke her hip after another student bumped into her on the way back from recess. *Slade*, 785 So. 2d at 1078 (¶¶4-5). Here, as in *Slade*, the injury occurred suddenly with no forewarning, and Cheaves would not have been able to prevent it even if she had been standing right next to A.B. watching. Like students running around at recess, it was ordinary and reasonable behavior for students to be on their phones, standing, and dancing (or jumping) in show choir class.

¶24. Finally, the Bumpouses argue that TCSD was negligent because Smith did not properly inform Cheaves about the TikTok challenge. The Bumpouses cite no caselaw to support this contention. Smith did testify that she knew of the challenge, but she also said that she had no indication that the challenge had reached Iuka Middle School. Furthermore, she stated that she notified the teachers of the challenge's existence through a teacher's forum rather than an email.[3] Although Smith testified that teachers participated in the teacher's forum less frequently, the Bumpouses did not deny that Smith notified the teachers.

---

[2] The dissent discusses the bullying allegations regarding A.B. We too find the allegations of bullying appalling. However, the bullying is not relevant to our current issue. A.B. admittedly loved his show choir class and felt it was a safe space. There had never been any instances of bullying in show choir class, and Cheaves was unaware of any other instances of A.B. being bullied. The dissent's discussion of bullying is therefore misplaced.

[3] Smith did not remember the name of the school-wide teacher's forum, but she described it as a "Facebook thing."

10

Instead, the Bumpouses compare this notice to another instance when Smith sent an email to the faculty because a TikTok challenge involving vandalizing bathrooms was trending. However, the Bumpouses have not pointed this Court to any established duty that requires school administrators to notify teachers of issues via email rather than another medium.

¶25. The teacher's forum, while yielding less teacher participation, was an official line of communication that Smith used. Smith testified that her common practice was to inform teachers of potentially harmful TikTok trends, whether that be through email, the teacher's forum, or other applications.[4] Using the teacher's forum to notify teachers of the "Skull Crusher" was reasonable given that it was an official method of communicating with teachers and that the challenge had yet to be observed at Iuka Middle School. There was also no proof that Cheaves knew of that TikTok challenge or that, from the situation occurring in her class, she could reasonably foresee it being acted out by her students. Therefore, the Bumpouses fail to establish that Smith's actions or inactions breached the duty of ordinary care.

## CONCLUSION

¶26. Viewing the evidence in the light most favorable to the Bumpouses, we find no genuine issue of material fact that would warrant the reversal of the court's grant of summary judgment. The Bumpouses have failed to show that TCSD has breached its duty of ordinary care to A.B. Therefore, we affirm the circuit court's grant of summary judgment in favor of TCSD.

---

[4] Smith testified that the school also used an application called "Remind" as another form of communication.

11

¶27.   **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.  WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J.; WESTBROOKS AND McDONALD, JJ., JOIN IN PART.**

**McCARTY, J., DISSENTING:**

¶28.   Our standard of review tells us that if there are genuine issues of material fact, we must deny summary judgment.  Witness after witness described Bethany Cheaves' classroom at Iuka Middle as a place where "you could basically just do whatever you wanted," and even the teacher herself admitted there was "chaos."

¶29.   With these facts—these *admitted* facts—taken in the light most favorable to this family, summary judgment must be reversed and the case sent to trial.

¶30.   State law declares that it is "the duty of each superintendent, principal and teacher in the public schools of this state to . . . hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess."  Miss. Code Ann. § 37-9-69 (Rev. 2019).  This law "imposes upon school districts a ministerial duty to 'use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment.'"  *J.E. v. Jackson Pub. Sch. Dist.*, 264 So. 3d 786, 791 (¶13) (Miss. Ct. App. 2018) (quoting *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 776 (¶14) (Miss. 2016)).

¶31.   And as the majority acknowledges, "[t]he school is not an insurer of the safety of pupils, but has the duty of exercising ordinary care, of reasonable prudence, or of acting as

12

a reasonable person would act under similar circumstances." *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc*., 759 So. 2d 1203, 1213 (¶40) (Miss. 2000).

¶32. That case, and that point, are exactly why summary judgment should have been denied in this case. Because witness after witness—from the student who was hurt, to the girls who attacked him, to his very teacher—painted a picture of a school that didn't use ordinary care but, instead, used *no care*.

¶33. In his deposition, A.B. described the rule-free zone that was show choir. Ms. Cheaves had been "kind of strict" with phone restrictions at "the beginning of the year," but this dwindled over the course of the year. By the end, "[y]ou could have your phone out whenever you wanted, and you could basically just do whatever you wanted in that class. So it kind of felt like a free period."

¶34. With the students glued to their phones, the teacher wasn't paying much attention either. In her deposition, Ms. Cheaves agreed with the assessment of A.B.'s lawyer that show choir was chaotic. In planning the impending trip to Nashville, the teacher described class that day as "you know, a little bit of chaos, a little bit of stress . . . ." And one of the students in the class agreed the class lacked structure: when asked, "Was this a free day?" she responded, "I consider it one."

¶35. Crucially, one of the girls who hurt A.B. related that it was completely normal for them to have their phones out and make videos. "[E]verybody would usually like be making TikToks and stuff like that in the room," she said.

¶36. When asked, "[D]id y'all do this like [film this video] out in the open, or did you have

to like sneak it?" the girl said, "Oh, no. She knew everybody was on their phone. They'd like be in the middle of the floor setting up their phone to do TikTok dances."

¶37.	The depositions of A.B. and his teacher established the lack of attention and order in the class, just as the other witnesses set out how there was an anything-goes environment. The deposition of the principal at the time, Chrystal Smith, makes clear what can happen in a vacuum. She described the two girls who concocted the horrific prank on the boy as good students, who took accountability for their actions, with one almost hyperventilating with concern. And even with the most careful of phrasing, the principal still admitted, "[G]enerally that classroom is a little bit different than our other classrooms." Taking the evidence in the light most favorable to this family, but for the lack of care and attention in show choir, A.B. wouldn't have been injured.

¶38.	The majority focuses on whether there was a cell phone policy, if it was broken, or if the teacher was merely inattentive. None of that addresses the statute's requirement that students shall be held "to strict account" or that repeated testimony established the show choir class was an accident waiting to happen. It's no mistake the teacher and the student both described the class where the boy was so badly hurt as chaotic.

¶39.	And what A.B. experienced wasn't just a brief flash of embarrassment from a schoolhouse prank. He was left on the floor in pain; after an ambulance ride to Tupelo, CAT scans, and X-rays, he was diagnosed with a bruised back and headaches and had to wear a brace on his neck. He still wasn't done suffering.

¶40.	The testimony in this case established A.B. was already having a hard time at Iuka

14

Middle—he called it "terrible" because he "got bullied a lot outside of show choir." Ironically, that's the only class he liked even though it cost him dearly. Notably, he was bullied so badly in part because he enjoyed "show choir instead of sports." Before that day, A.B. already "dreaded going to school in general." The bullying was so bad he told the school counselor that he "wanted to kill myself."

¶41. But after the so-called "prank," it was worse. A.B. testified he experienced trust issues since show choir was the one place he felt safe. People he thought were his friends hurt him. He now suffers from anxiety and panic attacks.

¶42. After he was humiliated and hurt in show choir, A.B. tried to kill himself. When asked what triggered the attempt, he explained it "stemmed out from . . . all the bullying that I went through for the four years" at Iuka and "[a] little bit" because of that one day in show choir.

¶43. It wasn't just State law that wasn't followed that day at Iuka Middle but applicable handbooks and codes as well. Standard 1.2(e) of the Mississippi Educator Code of Ethics highlights that unethical conduct includes "failure to provide appropriate supervision of students and reasonable disciplinary actions." And under Standard 4.1(e) of the same code, Ms. Cheaves was ethically required to "provid[e] an environment that does not needlessly expose students to unnecessary embarrassment or disparagement."

¶44. What's more, the Mississippi Department of Education's School Safety Manual notes:

> If a school does not have control of the school environment and the student population by sound daily operating procedures there will be such a level of disruption, or lack of confidence by participants, the education process will be hampered at all levels.

15

This of course includes "student monitoring."

¶45. Echoing State law, the Tishomingo County School District's Student Handbook acknowledges that "when students fail to exercise self-discipline, it becomes the responsibility of school personnel to take steps to alter behavior." The Handbook asserts that "administrators and teachers *shall* hold students to **strict account** for disorderly conduct at school[.]" (Emphasis added). In addition, the Tishomingo County School District required staff and administrators to sign a "Promise of Conduct and Performance" form promising, inter alia, to "provide a safe environment for learning."

¶46. The Legislature mandates our schools hold students to strict account, and these various handbooks and codes of ethics all amplify this crucial safeguard. They are implemented to establish care for students, to protect them from harm, and to allow them to flourish in a place of learning. When the statute is violated, and there is evidence the school didn't exercise ordinary care to protect a child, summary judgment is not appropriate. With the sheer volume of evidence in this case, summary judgment should not have been granted, and today we should reverse and remand for trial.

**CARLTON, P.J., JOINS THIS OPINION. WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION IN PART.**